**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **RICHARD BASCIANO, d/b/a 303 WEST** | : | **CIVIL ACTION** |
| **42nd STREET REALTY,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **NO.  2:11-cv-1250-JD** |
| **v.** | : | |
| | : | |
| **L&R AUTO PARKS, INC.;** | : | |
| **ENTERPRISE PARKING COMPANY,** | : | |
| **LLC, t/a FIVE STAR PARKING, a** | : | |
| **California General Partnership; and FIVE** | : | |
| **STAR PARKING, a California General** | : | |
| **Partnership,** | : | |
| | : | |
| **Defendants.** | : | |

_____

**DuBOIS, J.**                                                                          **February 10, 2012**

**M E M O R A N D U M**

**I. INTRODUCTION**

In this action, plaintiff Richard Basciano asserts a claim for breach of contract[1] against

defendants L&R Auto Parks, Inc.; Enterprise Parking Company, LLC; and Five Star Parking

("Five Star").[2] The dispute arises out of a lease agreement ("Parking Lease" or "Lease") between

Basciano and Five Star for a parking garage ("Garage") in Philadelphia, Pennsylvania. Plaintiff

---

[1] The Amended Complaint does not explicitly state that plaintiff's claim is for breach of contract.
However, plaintiff seeks solely money damages stemming from a lease agreement between
plaintiff and Five Star Parking. Thus, the Court treats plaintiff's claim as one for breach of
contract.

[2] Five Star sold the name "Five Star Parking" to Ampco Systems Parking and now operates
under the name LR FSP. Because Five Star appears in the caption under its former name, this
Memorandum will refer to it as such.

alleges that Five Star failed to pay the full amount of the rent, fees, taxes, and insurance premiums due under the Lease.

Plaintiff and Five Star have filed cross-motions for summary judgment. For the reasons that follow, the Court denies Plaintiff's Motion for Summary Judgment and grants in part and denies in part Five Star's Motion for Summary Judgment.

## II. BACKGROUND

### A. Parking Lease and First Two Riders

On April 11, 1997, Five Star entered into the Lease Agreement with Dimeling and Schreiber Garage Partnership, the owner of the property located at 618-634 Market Street in Philadelphia, to lease the property for use as a public parking garage. (Parking Lease, Pl. Richard Basciano's Mot. Summ. J. ("Pl.'s Mot.") Ex. C.) The Lease was for a five-year term to begin on May 1, 1997, and called for an annual rent of $410,000, payable in equal monthly installments of $34,166.00, plus taxes and fees. (Id.) On September 18, 1997, plaintiff purchased the property from Dimeling and Schreiber Garage Partnership and the Lease was assigned to plaintiff. (Deed, Pl.'s Mot. Ex. B.) On April 25, 2002, Five Star and plaintiff executed a rider to the Lease ("First Rider") extending the Lease for two years. (First Rider, Pl.'s Mot. Ex. D.) The First Rider stated, "All of the other terms and conditions of the Lease shall remain unchanged and in full force and effect." (Id.) Five Star and plaintiff executed another rider ("Second Rider") on April 20, 2004, extending the term for an additional ten months ending on February 28, 2005. (Second Rider, Pl.'s Mot. Ex. E.) The Second Rider stated, "All of the other terms and conditions of the Lease shall remain unchanged and in full force and effect." (Id.)

2

**B. The Third Rider**

Some time in 2004, Joseph Lumer,[3] the CEO of Five Star, and Germane Sahle, Senior

Vice President of Five Star, met with plaintiff and Thomas Simmonds, plaintiff's property

manager for the Garage, to discuss another extension of the Lease. (Simmonds Dep. 47, Nov. 3,

2011.[4]) During that meeting, Five Star and plaintiff agreed to extend the lease for one additional

year and reduce the rent to $339,992.04 per year, to be paid in equal monthly installments of

$28,322.67, plus taxes and fees. (Id.) Plaintiff and Five Star executed another rider to the Lease

("Third Rider") on February 9, 2005, containing these changes. (Third Rider, Pl.'s Mot. Ex. F.)

Like the First and Second Riders, the Third Rider stated, "All of the other terms and conditions

of the Parking Lease shall remain unchanged and in full force and effect." (Id.)

The parties dispute the nature of the discussions that preceded the Third Rider. Plaintiff,

Simmonds, and Sahle[5] all testified at their depositions that the parties agreed that the rent

reduction would last only one year. However, Five Star contends that the parties agreed that the

rent reduction would be permanent. The record contains no evidence other than the testimony of

---

[3] Mr. Lumer is deceased.

[4] Various pages of the Simmonds Deposition are attached to both parties' motions and responses.
The Simmonds Deposition is attached as: Exhibit C to Defendant LR FSP's Response to
Plaintiff's Statement of Material Facts (pages 42, 43, 46, 47, 49, 50, 181, 232–36, and 243);
Exhibit D to Defendant LR FSP's Statement of Material Facts (pages 6, 38–43, 46, 50, 51, 84,
85, 92, 93, 116–20, 131, 143–52, 158–61, 166, 167, and 181, and Exhibits 1, 7, and 8); and
Exhibit E to Plaintiff's Response to Defendant's Motion for Summary Judgment (pages 85, 88,
101, 102, 147, 152, 153, 158, 160, 166, 177, and 212).

[5] Although Sahle was Five Star's representative at the time, Five Star claims that Sahle "is
influenced and biased towards [plaintiff] due to Mr. Sahle's substantial business and financial
ties to [plaintiff]." (Def. LR FSP's Resp. Pl's Statement of Material Facts, 12.) Plaintiff owns
properties containing parking garages that Sahle manages, and Sahle has recently asked plaintiff
to invest in his new company. (Sahle Dep., Oct. 5, 2011, Def. LR FSP's Resp. Pl's Statement of
Material Facts Ex. D, at 27–29; Basciano Dep., Nov. 16, 2011., Def. LR FSP's Resp. Pl's
Statement of Material Facts Ex. F, at 138, 140.)

plaintiff, Simmonds, and Sahle regarding what occurred at the 2004 meeting or as to whether

plaintiff or Five Star intended the rent reduction to be temporary or permanent.

### C. The Fourth Rider

On February 24, 2006, Five Star and plaintiff entered into a subsequent rider ("Fourth

Rider"), extending the Lease another thirty-four months until December 31, 2008. (Fourth Rider,

Pl.'s Mot. Ex. G.) The Fourth Rider does not mention the rent reduction contained in the Third

Rider, nor does it reference the original rent amount in the Lease. Rather, the Fourth Rider states

only that "[a]ll of the other terms and conditions of the Parking Lease shall remain unchanged

and in full force and effect." (Id.) The parties have presented conflicting evidence regarding the

amount of rent due under the Fourth Rider.

Plaintiff produced a series of letters that Simmonds allegedly sent to Sahle beginning in

March 2006. (Letters, Pl.'s Mot. Ex. L.) Plaintiff has not produced any responses to these letters,

and Five Star claims that it never received any of the letters, (Def. LR FSP's Resp. Pl.'s

Statement Material Facts ¶ 13), although Sahle claims he received them, (Sahle Dep. 149, Oct. 5,

2011[6]).  There are seven letters allegedly sent during the period covered by the Fourth Rider.

(Letters, Pl.'s Mot. Ex. L.) Many contain statements that arguably demonstrate Five Star told

plaintiff it understood that the rent reduction contained in the Third Rider was temporary and had

agreed to pay the higher rent under the Fourth Rider. For example, in the September 18, 2006,

letter, Simmonds wrote to Sahle that plaintiff was "feeling the effects of . . . the deficient

---

[6] Various pages of the Sahle Deposition are attached to both parties' motions and responses. The
Sahle Deposition is attached as: Exhibit M to plaintiff's Motion for Summary Judgment (pages
129, 133, 135, 137–41, 144, 149, and 152); Exhibit D to Defendant LR FSP's Response to
Plaintiff's Statement of Material Facts (pages 27–29, 73–77, 98–101, 108, and 143–50); Exhibit
H to defendant's Motion for Summary Judgment (page 93); and Exhibit F to plaintiff's response
to defendant's Motion for Summary Judgment (pages 35, 129, 133, 135, 137–41, 144, 149, 152,
and 161).

remittances from Five Star. I know you are extremely busy <u>and have assured me that this is</u> <u>simply an 'oversight' in the accounting department</u>—but it is adding up!" (<u>Id.</u> (emphasis added).) Similarly, a letter dated April 21, 2008, states that Sahle had "advised [Simmonds] that the rent arrears situation [would] be resolved." (<u>Id.</u>)

However, the letters also contain evidence that Five Star had not conceded that the rent under the Fourth Rider was to be for the original amount. A March 1, 2006, letter—the first letter Simmonds allegedly sent to Five Star after the execution of the Fourth Rider—states that the rent due under the Fourth Rider reverted to the original higher amount. (<u>Id.</u>) The September 18, 2006, letter discussed above, also states, "The Lease speaks for itself so I can't imagine what the <u>breakdown in communication</u> is—the reduction was for a one-year period that passed six months ago." (<u>Id.</u> (emphasis added).) Finally, a letter from September 22, 2008, refers to the parties' negotiations regarding a new rider and states, "This may seem premature but before we commence any discussions regarding the lease's extension, I wanted to inform you that under no circumstances will we consider signing same for less than the $410,000/year base rent charge now in place." (<u>Id.</u>)

Simmonds and Sahle aver that Five Star conceded it owed plaintiff the higher rent under the Fourth and Fifth Riders and that Sahle continually assured plaintiff that Five Star would "pay the rent arrears for March 1, 2006 to the present." (Sahle Dep. 149; <u>see also</u> Simmonds Decl., Dec. 9, 2011, Pl.'s Mot. Ex. J, ¶¶ 12, 13.) This testimony is consistent with the letters plaintiff produced, discussed above. However, Five Star has produced evidence that undermines Sahle's and Simmonds's contentions. First, Sahle testified that Five Star's management approved the assurances to plaintiff but there is no written record of this approval. (Sahle Dep. 149.) David Damus, who worked at Five Star at the relevant time, states that, "pursuant to [Five Star]

5

Company policy, all rent increases at that time would have to be submitted to my [sic] in writing and ultimately approved by myself and ownership." (Damus Decl., Jan. 12, 2012, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. E, ¶ 8.) Damus also testified that, contrary to Sahle's testimony, he and Sahle never discussed a rent increase relating to the Garage. (Id.; Sahle Dep. 150.).

### D. The Fifth Rider

Five Star made rent payments under the Fourth Rider in the lower amount specified in the Third Rider. (Tenant Ledger, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. B.) When the term of the Fourth Rider ended at the end of 2008, Plaintiff and Five Star executed another rider ("Fifth Rider") to extend the term of the Lease by one year until December 31, 2009. (Fifth Rider, Pl.'s Mot. Ex. H.) The Fifth Rider did not mention the amount of rent due during its term and stated, "All of the other terms and conditions of the Parking Lease shall remain unchanged and in full force and effect." (Id.)

Plaintiff has produced four more letters that Simmonds allegedly sent to Sahle during the term covered by the Fifth Rider. (Letters, Pl.'s Mot. Ex. L.) As with the letters allegedly sent during the term of the Fourth Rider, plaintiff has not produced responses to these letters and Five Star claims that it never received any of these letters. (Def. LR FSP's Resp. Pl.'s Statement Material Facts ¶ 13.) The letters refer to the amount of rent due under the Fourth and Fifth Riders. A letter dated January 5, 2009, encloses a copy of the Fifth Rider and states that the Fifth Rider "was executed based on [Five Star's] assurances that the rent arrears due for the period March 1, 2006–present ($192,522) would be paid within ninety (90) days." (Letters, Pl.'s Mot. Ex. L.) Another letter, dated July 22, 2009, refers to a meeting that the parties allegedly planned to have thereafter to discuss the dispute over the amount of rent due. (Id.)

6

### E. Holdover and Assignment

The parties did not execute a rider to the Lease Agreement subsequent to the Fifth Rider. However, Five Star continued to occupy the Garage and pay $28,322.67 per month, plus taxes and fees—the amount called for under the Third Rider—until October 4, 2010. (See Tenant Ledger, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. B.) Plaintiff did not object to Five Star's continued occupancy and accepted rent payments from Five Star. (Simmonds Dep. 181.)

On September 30, 2010, Five Star sold its parking operations and name to Ampco Systems Parking ("Ampco"). (Decl. John C. Day Supp. Def. LR FSP's Mot. Summ. J. ("Day Decl.") ¶¶ 6–8, Dec. 14, 2011.[7]) The original Lease Agreement stated, "Tenant may not assign this Lease or sub-let the Leased Premises or any portion thereof without Landlord's prior written consent." (Parking Lease, Pl.'s Mot. Ex. C, ¶ 6.) Five Star never informed plaintiff that Five Star was assigning its interest in the Garage to Ampco, but Ampco began making rent payments to plaintiff in the amount of $28,322.67, plus taxes and fees, on November 1, 2010. (Ampco Checks, Def. LR FSP's Statement Material Facts Ex. E.) Simmonds endorsed rent checks from Ampco with variations of "accepted under protest" and "accepted without prejudice or waiver." (Id.; Simmonds Dep. 144–45.)

---

[7] Five Star has submitted two declarations of John. C. Day. The one cited in this Memorandum is dated December 14, 2011, and relates mostly to the issue of the insurance coverage, discussed below, infra Sections II.F. and IV.B. Five Star also attached to its response to plaintiff's Motion for Summary Judgment a declaration of Mr. Day dated January 12, 2012, which relates to the dispute over the amount of rent due under the Fourth and Fifth Riders. (Decl. John C. Day Supp. Def. LR FSP's Resp. Pl.'s Mot. Summ. J., Jan. 12, 2012, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. H.) In his Reply Brief in Support of Plaintiff's Motion for Summary Judgment, plaintiff argues that the January 12, 2012, Day Declaration is inadmissible. The Court does not rely on this Declaration in reaching its conclusions in this Memorandum, and thus need not rule on the admissibility of the January 12, 2012, Day Declaration.

While Ampco occupied the Garage, plaintiff and Simmonds had various discussions with Ampco representatives. The parties dispute the content of those discussions. Five Star alleges that the discussions centered on Ampco's attempt to renew the lease and a possible management agreement between plaintiff and Ampco. (Simmonds Dep. 160.) Five Star also points out that plaintiff testified that he contacted Ampco to tell Ampco that it "must comply with the terms of the lease." (Basciano Dep. 120, Nov. 16, 2011.[8]) Plaintiff argues that he never accepted Ampco as a new tenant. When Ampco called regarding the Lease, Simmonds said, "I have no idea why you're contacting me concerning a garage that is leased to Five-Star Parking." (Simmonds Dep. 152.) Further, Five Star never notified plaintiff that it was assigning its interest in the Garage to Ampco, although Sahle told Simmonds that Five Star had sold "some of its leases" to Ampco. (Id. at 150.) Finally, the sign on the Garage continued to say "Five Star Parking," (id. at 153), and plaintiff continued to send monthly rent bills to Five Star rather than Ampco, (id. at 158).

Ampco ceased its occupation of the Garage in July 2011. (Tenant Ledger, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. B.) The parties dispute whether Ampco left of its own accord or plaintiff evicted Ampco. (Pl. Richard Basciano's Resp. Opp'n Def. Five Star Parking's Statement Material Facts Connection Def. Five Star Parking's Mot. Summ. J. ¶ 34.)

Plaintiff initiated this action in the Court of Common Pleas for Philadelphia County on January 25, 2011. Defendants removed the case to this Court on February 23, 2011.

---

[8] Various pages of the Basciano Deposition are attached to both parties' motions and responses. The Basciano Deposition is attached as: Exhibit K to plaintiff's Motion for Summary Judgment (pages 65 and 66); Exhibit F to Defendant LR FSP's Response to Plaintiff's Statement of Material facts (pages 35, 36, 138, 140, 141, and 143–62); Exhibit F to Defendant LR FSP's Statement of Material Facts (pages 120, 129, and 130); and Exhibit G to plaintiff's response to Five Star's Motion for Summary Judgment (pages 108, 123, 124, 127, 129, and 130).

**F. Insurance**

Paragraph Twenty of the Lease requires the tenant to maintain "general Liability or Garage Liability insurance coverage with a per location limit of $1,000,000.00 with an insurance carrier licensed to do business in the Commonwealth of Pennsylvania and having a Best Rating of A8 or better." (Parking Lease, Pl.'s Mot. Ex. C.) Plaintiff claims that Five Star did not obtain insurance that met these requirements, and plaintiff is suing to recover the cost of premiums that plaintiff paid for insurance coverage to make up for that failure. (Tenant Ledger, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. B.) In support of its contention that Five Star failed to maintain adequate insurance, plaintiff cites Simmonds's testimony that plaintiff's insurance agent and broker advised Simmonds that the "insurance certificates that had been provided to [plaintiff] were defective." (Simmonds Dep. 102.)

Five Star submitted with its motion certificates of insurance and excerpts of policies that it claims prove it maintained adequate insurance throughout the term of the Lease and subsequent Riders. In a footnote in Five Star's Memorandum of Law in Support of Its Motion for Summary Judgment, Five Star explains that "[t]he insurance certificates and policies total over 800 pages in length. Thus, [Five Star] provides the Court with the insurance certificates and relevant excerpts from the corresponding insurance policies. If needed, full copies of the applicable insurance policies can be provided." (Def. LR FSP's Mem. Law Supp. Mot. Summ. J. 6 n.3.)

**G. 2011 Real Estate Taxes**

Plaintiff also claims that Five Star is liable for $167,108.80 in unpaid real estate taxes. (Tenant Ledger, Def. LR FSP's Resp. Pl.'s Statement Material Facts Ex. B.) The Lease Agreement required Five Star to pay all city and state taxes on the Garage. (Parking Lease, Pl.'s

9

Mot. Ex. C, ¶ 4.) Five Star paid these taxes on February 22, 2011. (Simmonds Dep. Exs. 7–8.) Plaintiff also paid these taxes because he was not aware that Five Star had done so. (Pl.'s Mem. Law Opp'n Def. Five Star Parking's Mot. Summ. J. 18–19.) Plaintiff is currently waiting for a response from the City of Philadelphia as to whether the taxes were paid twice and whether he will receive a refund. (Id. at 19.)

## III. STANDARD OF REVIEW

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support its claim. Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). After examining the evidence of record, a court should grant summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

**IV. DISCUSSION**

In his motion, plaintiff asks the Court to grant summary judgment in his favor on the issue of Five Star's liability for failing to pay the proper amount of rent.[9] Plaintiff argues that the Lease and subsequent Riders express the parties' clear intent that the rent decrease in the Third Rider would not carry over to the Fourth Rider.

In its motion, Five Star argues that the plain text of the Lease and Riders compel the opposite finding—that the rent decrease in the Third Rider was to be permanent and that Five Star was responsible for paying only $28,322.67 per month, plus taxes and fees, beginning with the Third Rider, continuing through the Fourth and Fifth Riders, and into the holdover period.

Five Star also asks the Court to grant summary judgment in its favor on a number of minor issues. First, Five Star argues that it is not liable for failing to maintain adequate insurance on the property. Second, Five Star argues that it is not liable for any breach occurring after it allegedly assigned the Lease to Ampco on September 30, 2010. Third, Five Star contends that, even if it is liable for rent accruing after September 30, 2010, its obligation to plaintiff ended on December 31, 2010, because Ampco—not Five Star—held over into 2011. Fourth, Five Star argues that plaintiff's claims for rent that accrued prior to January 25, 2007, are time-barred. Fifth, Five Star asks the Court to grant summary judgment in its favor on the issue of the 2011 real estate taxes. Finally, Five Star argues that it is not liable for attorneys' fees under the Lease. Plaintiff responds that there are genuine issues of material fact as to all six of these questions.

---

[9] Although plaintiff titles his motion a Motion for Summary Judgment, it is actually a motion for partial summary judgment, in that plaintiff seeks summary judgment "on the issue of Defendant-Five Star Parking's liability for failing to pay the annual minimum rent as called for under the Lease and Riders." (Proposed Order, Pl.'s Mot.)

## A. Alleged Underpayment of Monthly Rent

According to plaintiff, the parties agreed that the Third Rider's reduction in rent was only temporary and that under the Fourth and Fifth Riders, Five Star was to pay the original amount. Defendant argues the opposite—that the parties agreed that the rent reduction in the Third Rider would be permanent. Both parties assert that the plain text of the Fourth Rider, the parties' intent, and parol evidence support their reading.

When interpreting a contract under Pennsylvania law, the court must first determine whether, as a matter of law, the language is ambiguous. See In re Nelson Co., 959 F.2d 1260, 1263 (3d Cir. 1992); St. Paul Fire & Marine Ins. Co. v. Lewis, 935 F.2d 1428, 1431 (3d Cir. 1991) ("Determining whether the terms of a contract are ambiguous is a question of law."). If the contract is ambiguous, the fact finder must interpret it; if the language of the contract is clear, the Court interprets the agreement. Nelson, 959 F.2d at 1263; STV Eng'rs, Inc. v. Greiner Eng'g, Inc., 861 F.2d 784, 787 (3d Cir. 1988). A contract is not ambiguous if a court "can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction." Dept. of Transp. v. Brozzetti, 684 A.2d 658, 663 (Pa. Commw. Ct. 1996). The court may not consider extrinsic evidence in interpreting an unambiguous contract; only the fact finder may do so upon a court's determination that the agreement is ambiguous. Id.

It is difficult to imagine a more ambiguous contract than the contract at issue in this case. Neither the Fourth nor the Fifth Rider states how much Five Star was required to pay in monthly rent. Instead, they simply state, "All of the other terms and conditions of the Parking Lease shall remain unchanged and in full force and effect." (Fourth Rider, Pl.'s Mot. Ex. G.) It is impossible

12

to tell from the documents whether the term "Parking Lease" refers to the original Lease absent any of the Riders, or to the Lease together with all of the Riders, including the Third Rider.

Because the contract is ambiguous, parol evidence is admissible. <u>Yocca v. Pittsburgh Steelers Sports, Inc.</u>, 854 A.2d 425, 437 (Pa. 2004). In this case, the parol evidence creates a genuine issue of material fact as to whether the parties intended for the rent decrease in the Third Rider to continue throughout the terms of the Fourth and Fifth Riders. Plaintiff argues that the testimony of all witnesses personally involved in the negotiations and the letters Simmonds sent to Sahle support its position. Five Star contends that plaintiff's witnesses are all biased in plaintiff's favor. Five Star also questions the authenticity of the letters, pointing out that it never received them and plaintiff has failed to produce any responses. Further, Five Star argues that, even if they are authentic, the letters are ambiguous. Some statements in the letters imply that Sahle acknowledged that Five Star owed the higher rent, while others refer to a "breakdown in communication." (Letter from Thomas Simmonds to Germame Sahle (Sept. 18, 2006), Pl.'s Mot. Ex. L.)

The Court concludes that the contract in this case is ambiguous and that there is a genuine issue of material fact regarding the parties' intentions as to the amount of the rent payments under the Fourth and Fifth Riders. Thus, the Court denies plaintiff's Motion for Summary Judgment and denies Five Star's Motion for Summary Judgment with respect to the rent payments beginning March 1, 2006—the date the Third Rider ceased to be effective.

### B. Insurance

Both parties agree that Five Star was required to maintain "general Liability or Garage Liability insurance coverage with a per location limit of $1,000,000.00 with an insurance carrier licensed to do business in the Commonwealth of Pennsylvania and having a Best Rating of A8 or

better." (Lease Agreement, Pl.'s Mot. Ex. C.) The parties dispute whether Five Star complied with this requirement. Plaintiff relies on the opinion of his insurance agent and broker, who told plaintiff that the insurance that Five Star purchased was not adequate.[10] (Simmonds Dep. 102.) Five Star relies on certificates of insurance and excerpts of the policies, which it claims prove that it maintained adequate insurance.

There is a genuine issue of material fact as to whether the insurance that Five Star purchased was sufficient to meet the requirements of the Lease. If called to testify at trial, plaintiff's insurance agent and broker might demonstrate why Five Star's insurance was inadequate. Further, the documents Five Star produced do not conclusively show that it purchased adequate insurance. None of the documents demonstrate that any of the insurers were licensed in Pennsylvania, nor do they establish that any of the insurers had a Best Rating of A8 when the policies were in force. (See Day Decl. Ex. 1.) Five Star offered to submit more than 800 pages of documents that allegedly prove that it purchased adequate insurance. However, the Court has had immense difficulty interpreting the documents that Five Star filed with its motion. The Court thus concludes that a jury, with a proper evidentiary foundation including expert testimony, is required to determine the significance of these documents and decide whether Five Star purchased insurance that met the requirements of the Lease.

---

[10] Five Star argues that this evidence is inadmissible hearsay and thus, the Court may not rely on it at the summary judgment stage. This statement is incorrect. "[T]he Third Circuit has held that hearsay evidence may be considered at the summary judgment stage if the 'declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial.'" Rossi v. Schlarbaum, 600 F. Supp. 2d 650, 665 (E.D. Pa. 2009) (quoting J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990)). In this case, plaintiff could produce the insurance agent and broker to testify as to what he or she said to Simmonds as well as his or her opinion as to the adequacy of Five Star's insurance policies.

Plaintiff also argues that, "[a]ssuming arguendo that [Five Star] can now produce adequate proof that insurance coverage as required by the Lease was in place, the time and place when [Five Star] was obliged to do so was at the time the insurance policies were to be renewed, not now, years later." (Pl.'s Mem. Law Opp'n Def. Five Star Parking's Mot. Summ. J. 9.) Plaintiff's argument on this issue misses the point. The Lease requires Five Star to purchase insurance, but it does not require Five Star to notify plaintiff of the nature of that insurance.[11] Thus, if Five Star can prove at trial that it purchased adequate insurance, it will not be liable for breach due to any failure to notify plaintiff of that fact.

In conclusion, the Court denies Five Star's Motion for Summary Judgment with respect to the issue of whether Five Star is liable for failing to purchase adequate insurance.

### C. Liability of Five Star After "Assignment" to Ampco

Five Star argues that, even if a jury finds that the Fourth and Fifth Riders required Five Star to pay the original rent, it cannot be liable for failing to pay the proper amount of rent for any month after September 30, 2010, because Five Star assigned its rights and liabilities under the Lease to Ampco on that date. The Court concludes that genuine issues of material fact foreclose the granting of summary judgment in Five Star's favor on this issue.

To show that it is not liable for monthly rent accruing after September 30, 2010, Five Star must show: (1) that its assignment of its rights and liabilities under the Lease to Ampco was effective, and (2) that plaintiff released Five Star from its obligations under the lease. Bird Hill

---

[11] Plaintiff relies on Paragraph Eleven of the Parking Lease, which gives the tenant a grace period of fifteen days if the tenant defaults. (Parking Lease, Pl.'s Mot. Ex. C, ¶ 11.) Plaintiff argues that this required Five Star to inform plaintiff of the details of the insurance coverage upon request. However, nothing in Paragraph Eleven required Five Star to notify plaintiff of Five Star's compliance with the terms of the lease. Thus, the only question for the jury on this issue is whether Five Star actually purchased adequate insurance.

Farms, Inc. v. U.S. Cargo & Courier Serv., Inc., 845 A.2d 900, 907 (Pa. Super. 2004). The Court addresses each requirement in turn.

### 1. Assignment

Paragraph Six of the Lease states, "Tenant may not assign this Lease or sub-let the Leased Premises or any portion thereof without Landlord's prior written consent." (Lease Agreement, Pl.'s Mot. Ex. C.) A lease agreement may require the landlord's consent in order for the tenant to assign its right to the property. See Girard Trust Co. v. Cosgrove, 113 A. 741, 741–42 (Pa. 1921); see also Morrisville Shopping Ctr. v. Sun Ray Drug Co., 112 A.2d 183, 188 (Pa. 1955). Five Star did not seek plaintiff's express consent to the assignment. Rather, Five Star claims that plaintiff impliedly consented to the assignment and released Five Star from its obligations under the Lease.

There is a genuine issue of material fact whether plaintiff impliedly consented to the assignment of the Lease to Ampco. Consent to a tenant's assignment of the tenant's interest in a lease can be implied where the landlord, with knowledge of the facts, permits the assignee to remain in possession of the property and accepts subsequently accruing rents from the assignee. See Sferra v. Urling, 188 A. 185, 186 (Pa. 1936); Persing v. Marting, No. 82-c-2987, 1984 WL 2735, at *2 (Pa. Ct. Com. Pl. Lehigh Cnty., Nov. 5, 1984) (citing Sferra). Plaintiff accepted rent checks from Ampco after the purported assignment occurred.[12] However, it is not clear whether

---

[12] That plaintiff endorsed those checks by writing "accepted under protest" or "without prejudice" is immaterial to the question whether plaintiff consented to the assignment. Plaintiff has not cited any authority—and the Court has failed to uncover any—allowing a landlord to accept rent with full knowledge of a purported assignment without actually consenting to the assignment. Instead, a landlord must choose between accepting the assignment or evicting the tenant. See Sferra, 188 A. at 186 (stating general rule that accepting rent payments with knowledge of assignment constitutes consent).

plaintiff knew that Five Star had assigned its interest in the Garage to Ampco. While Sahle may have told Simmonds that Five Star "had sold some of its leases, assets, and properties to Ampco," (Simmonds Dep. 150), the parties dispute whether Sahle ever told Simmonds or plaintiff that Five Star had assigned the Lease to Ampco or that Ampco was operating the Garage (Sahle Dep. 135). Further, Simmonds expressed confusion when Ampco wanted to discuss the Garage or the terms of a new lease, which is consistent with the notion that he was unaware the Ampco was operating the Garage. (Simmonds Dep. 152.) Additionally, the sign on the front of the Garage continued to say "Five Star Parking" throughout the time in question. (Id. 153.) Finally, although plaintiff and Simmonds both spoke to Ampco representatives on numerous occasions, the nature of those discussions is unclear from the record.

### 2. Release

Even if a jury determines that plaintiff consented to the purported assignment, that would not relieve Five Star of its obligations under the Lease. Where a "lease includes an express covenant to pay rent, an assignment will relieve the lessee of liability for rent only if there is an express release or a release implied by the actions of the lessor other than its mere consent to the assignment or acceptance of rent from the assignee." Bird Hill, 845 A.2d at 907 (citing Gale Indus., Inc. v. Bristol Farmers Mkt. & Auction Co., 246 A.2d 391 (Pa. 1968)). Five Star argues that plaintiff impliedly released it from its obligation to pay rent.

---

Similarly, it is also immaterial that plaintiff told Five Star and Ampco that he was not accepting the assignment. Although the Court was unable to find any Pennsylvania authority on this issue, at least one court in another jurisdiction has held that a landlord may not accept rent payments with knowledge of the assignment and at the same time withhold consent by informing the assignee or assignor that the landlord was not consenting to the assignment. See Sarete, Inc. v. 1344 U Street Ltd. P'ship, 871 A.2d 480, 492 (D.C. 2005) (finding implied consent from acceptance of rent payments even though landlord "wrote [tenant/assignor] . . . that she considered him the tenant under the lease agreement").

In this case, there are genuine issues of material fact as to whether plaintiff impliedly released Five Star from its obligation to pay rent under the Parking Lease. Five Star cites <u>Bird Hill</u>, arguing that a landlord may impliedly release a tenant/assignor from its obligation to pay rent under a lease. 845 A.2d at 907. The <u>Bird Hill</u> court held that the landlord in that case had impliedly released the tenant/assignor because the landlord "treated [the assignee] as the sole lessee" and "directed all subsequent correspondence relating to the lease, its extension, and the contemplated expansion and improvements to the premises to [the assignee]." <u>Id.</u> Plaintiff points out that it continued to send rent bills to Five Star rather than Ampco and protested Ampco's occupation of the Garage to both Five Star and Ampco. (Simmonds Dep. 152, 158.) These facts are inconsistent with plaintiff's "treat[ing Ampco] as the sole lessee." <u>Bird Hill</u>, 845 A.2d at 907. Five Star points out that plaintiff discussed a renewal of the lease and a possible management agreement with Ampco representatives. (Simmonds Dep. 158, 159, 166, 167.) However, the precise nature of those conversations is unclear from the record, particularly as to whether plaintiff and Ampco were attempting to negotiate an extension to the Lease or a separate agreement unrelated to the Lease. (<u>See</u> Simmonds Dep. 160 (stating that the negotiations were about a new agreement and were unrelated to the purported assignment).)

### 3. Conclusion

Genuine issues of material fact exist as to both assignment and release. Thus, the Court denies Five Star's Motion for Summary Judgment on the issue of assignment and release.

### D.  Five Star's Obligations Under the Lease After December 31, 2010

Five Star argues that, even if is liable for any deficiencies in rent payments Ampco made to plaintiff after October 2010, it is not liable for any deficiencies in the rent after December 31,

2010, because its obligations under the Lease terminated on that date and Ampco, rather than Five Star, continued to occupy the Garage into 2011.

In the absence of evidence showing a contrary intent of the parties, where a tenant holds over after a lease expires and the landlord elects not to treat the tenant as a trespasser, such holdover creates a tenancy from year to year if the original term is for one year or longer. See Mack v. Fennell, 171 A.2d 844, 846 (Pa. Super. 1961); cf. Clairton Corp. v. Geo-Con, Inc., 635 A.2d 1058 (Pa. Super. Ct. 1993) (stating general rule, but finding evidence the parties intended to create a month-to-month lease). The Fifth Rider expired on December 31, 2009; Five Star continued to occupy the Garage until September 30, 2010, and plaintiff continued to accept rent and did not bring an action for trespass, thus creating a lease implied at law between plaintiff and Five Star for 2010. When that lease expired on December 31, 2010, Ampco held over and stayed until July 2011. The question, thus, is whether Five Star is liable under the implied lease that was created when Ampco held over into 2011.

Neither party has cited Pennsylvania authority that directly addresses this question. Nor has the Court been able to find any authority on this issue.[13] However, courts in other jurisdictions have held that the tenant/assignor is not liable for rent accruing after an assignee holds over, provided that the assignment was effective. See, e.g., Schottenstein Trs. v. Carano, No. 99AP-1222, 2000 WL 1455425, at *2 (Ohio Ct. App. Sept. 29, 2000) (following California law, which holds that "a lessee is liable as a surety for a hold over assignee only when the lessor

---

[13] One case, Hankin v. Graphic Technology, Inc., No. 2006-30821, 2010 WL 2510955 (Pa. Ct. Com. Pl. Montgomery Cnty. Jan. 26, 2010), held that the tenant/assignor was liable for rent after the assignee's holdover. However, the lease in that case had a clause calling for automatic yearly renewal of the term of the lease, which is absent in this case. This automatic renewal provision is crucial because it means that the landlord and tenant/assignor remained in privity of contract upon the automatic renewal of the lease. See Bird Hill, 845 A.2d at 907 n.3 (discussing privity of contract and privity of estate in this context).

does not consent to the assignment" (emphasis added)); <u>Meredith v. Dardarian</u>, 147 Cal. Rptr. 761, 764–65 (Cal. Ct. App. 1978), <u>cited in</u> <u>Schottenstein</u>, 2000 WL 1455425, at *2; <u>Cirigliano v. Cirigliano</u>, 278 N.Y.S.2d 64, 66 (Civ. Ct., City of N.Y., Queens Cnty. 1967) ("'It is well settled that when a tenant assigns his lease, and the assignee holds over, such holding over is not that of the tenantassignor. Therefore the penalties for the assignee's holdover will not be imposed on the assignor. If the assignee holds over, he alone will be held liable either as a trespasser or as a holdover tenant at the landlord's election.'" (quoting 1 Joseph Rasch, <u>Landlord and Tenant and Summary Proceedings</u> § 151 (1st ed. 1950))); <u>see also</u> <u>Matter of Brodd</u>, 44 B.R. 148, 150 (Bnkr. Wis. 1984) (discussing Wisconsin statute relieving tenant/assignor of liability for rent after assignee's holdover).

        As discussed above, <u>supra</u> Section IV.C.1, genuine issues of material fact exist as to whether plaintiff consented to the assignment to Ampco. If plaintiff consented to the assignment before Ampco held over beginning on January 1, 2011, the assignment would relieve Five Star of any liability for deficient rent payments in 2011.[14] However, if plaintiff never consented to the assignment, Five Star would be liable for the deficient rent during 2011. <u>See</u> <u>Schottenstein</u>, 2000 WL 1455425, at *2.

---

[14] This is the case even if plaintiff consented to the assignment but never released Five Star from liability under <u>Bird Hill</u>. 845 A.2d at 907. As the court in <u>Bird Hill</u> explained, the tenant/assignor is liable for the rent because it remains in privity of contract with the landlord until the term of the lease expires, even if privity of estate exists only between the landlord and the assignee. <u>Id.</u> at 907 n.3. However, once the term of the lease expires, there is no privity of contract, and if the assignment is effective, the tenant/assignor is no longer in privity of contract or privity of estate with the landlord. <u>See</u> <u>id.</u> ("[A]n assignment of the leasehold premises terminates the privity of estate."). Thus, in such a case, a release separate from the assignment is not necessary to absolve the tenant/assignor of liability for rent accruing after the assignee holds over.

Because genuine issues of material fact exist as to whether plaintiff consented to Five Star's assignment of the Lease to Ampco before Ampco held over past December 31, 2010, the Court denies Five Star's Motion for Summary Judgment with respect to this issue.

### E. Statute of Limitations

The statute of limitations for an action on a lease for real property is four years. See 42 Pa. Cons. Stat. § 5525(a)(8); In re Pa. Footwear Corp., Nos. 95-19785DAS, 97-103DAS, 1997 WL 351128, at *5 (Bankr. E.D. Pa. June 19, 1997). The cause of action accrues upon the due date of each periodic rent payment; i.e., "there is a separate and distinct cause of action for each missed installment payment, each of which has its own statute of limitations." Pa. Footwear, 1997 WL 351128, at *5. This is true even when the lease contains an acceleration clause, as the Parking Lease does in this case. See Resolution Trust Corp. v. Koock, 867 F. Supp. 284, 288 (E.D. Pa. 1994) ("'Where an installment contract contains an acceleration clause . . . the statute [of limitations] does not begin to run against [any particular installment] until each falls due in regular course.'" (quoting 4 Corbin on Contracts, § 951 (1951)) (first alteration added)). Plaintiff filed the instant action on January 25, 2011. Thus, Five Star argues, any claim for rent that was due before January 25, 2007, is time-barred.

Plaintiff argues that the "acknowledgment doctrine" and "payment on account doctrine" toll the statute of limitations. "Pursuant to the 'acknowledgement doctrine,' a statute of limitations may be tolled or its bar removed by a promise to pay the debt." Huntingdon Fin. Corp. v. Newtown Artesian Water Co., 659 A.2d 1052, 1054 (Pa. Super. Ct. 1995).

> There must, however, be no uncertainty either in the acknowledgement or in the identification of the debt; and the acknowledgement must be plainly referable to the very debt upon which the action is based; and also must be consistent with a promise to pay on demand and not accompanied by other

> expressions indicating a mere willingness to pay at a future time. A simple declaration of an intention to discharge an obligation is not the equivalent of a promise to pay, but is more in the nature of a desire to do so, from which there is no implication of a promise.

Id. (quoting Gurenlian v. Gurenlian, 595 A.2d 145, 151 (Pa. 1991)).[15]

The "payment on account doctrine" is similar; "payment on account of a debt is regarded as an acknowledgment of liability." Quaker City Chocolate & Confectionary Co. v. Delhi-Warnock Bldg. Ass'n, 53 A.2d 597, 600 (Pa. 1947); see also Huntingdon, 659 A.2d at 1054 ("There can be no more clear and unequivocal acknowledgment of debt than actual payment."). For a payment on a debt to qualify as an acknowledgment, it must be an "unequivocal acknowledgment" of the debt. For instance, in Huntingdon, a creditor sued a debtor for interest on a debt that the creditor claimed the debtor owed to it. 659 A.2d at 1054. The debtor paid the principal back, but failed to pay any interest. Id. at 1054–55. The Huntingdon court held that this payment did not toll the statute of limitations because it did not represent the debtor's acknowledgment that he owed the amount of interest that the creditor claimed. Id. Rather, a payment in the precise amount of the principal acknowledged only a debt in the amount of the principal. Id.

---

[15] Five Star cites Vadino v. A. Valey Engineers, 903 F.2d 253 (3d Cir. 1990), for the proposition that plaintiff can only assert the acknowledgment doctrine if his reliance on Five Star's acknowledgments was "reasonable." However, Vadino has nothing to do with the acknowledgment doctrine, focusing instead on general principles of estoppel. Reliance on an unequivocal acknowledgment is, necessarily, reasonable. Thus, the Court declines to require plaintiff to demonstrate reasonable reliance as a separate element of the acknowledgment doctrine.

Plaintiff argues that Five Star's continued rent payments were an "unequivocal acknowledgment of debt." The Court rejects this argument and concludes that <u>Huntingdon</u> governs this case. Five Star's rent payments were in the precise amount called for by the respective Riders to the Parking Lease (as Five Star claims it understood them). Thus, they could not be unequivocal acknowledgments of an additional debt, just as the payment of the exact amount of principal in <u>Huntington</u> was not an unequivocal acknowledgment of the additional debt of the interest.

Plaintiff also argues that Sahle repeatedly assured Simmonds and plaintiff that Five Star knew it was not making rent payments in the full amount required by the Fourth and Fifth Riders. As explained above, <u>supra</u> Section IV.A, genuine issues of material fact exist as to Sahle's responses to the letters Simmonds allegedly sent to him from 2006 to 2010. Thus, a jury is required to determine whether Sahle unequivocally acknowledged the debt and promised Simmonds that Five Star would pay upon plaintiff's demand.

Because genuine issues of material fact exist as to Sahle's alleged assurances to Simmonds and plaintiff, the Court denies Five Star's Motion for Summary Judgment as to the statute of limitations issue.

### F. 2011 Real Estate Taxes

It is undisputed that Five Star paid the taxes it owed to the City of Philadelphia under the Parking Lease on February 22, 2011. Plaintiff argues that Five Star failed to inform him of its payment, causing him to pay the taxes again. However, the Parking Lease does not require Five Star to <u>inform</u> plaintiff of its tax payments; instead, it only requires that Five Star <u>pay</u> the taxes. (Parking Lease, Pl.'s Mot. Ex. C ¶ 4.) By paying the taxes it owed to the City, Five Star

23

complied with its obligation under the Parking Lease. Thus, the Court grants Five Star's Motion for Summary Judgment as to the 2011 real estate taxes issue.

### G. Attorneys' Fees

Plaintiff makes a claim for attorneys' fees under the Parking Lease. The Lease permits plaintiff to collect "all unpaid rent and additional rent and all rent for the unexpired term of the Lease, together with all costs, commissions and attorneys' fees provided or permitted by law." (Parking Lease, Pl.'s Mot. Ex. C ¶ 9(a).) Plaintiff argues that this clause allows him to collect attorneys' fees from Five Star. Five Star responds that the clause only allows plaintiff to collect attorneys' fees provided for by law, and since plaintiff has cited no law that would allow him to collect attorneys' fees in this case, summary judgment in Five Star's favor on this issue is warranted.

In general, parties to a contract may agree that the breaching party will pay the attorneys' fees of the nonbreaching party. See McMullen v. Kutz, 985 A.2d 769, 771 (Pa. 2009). Five Star cites a Fifth Circuit case involving a contract clause that stated that the nonbreaching party "shall be entitled to recover, as allowed by law or contract, reasonable attorneys' fees and expenses." Curlett Family Ltd. P'ship, Ltd. v. Particle Drilling Techs., Inc., 254 Fed. App'x 320, 329 (5th Cir. 2007) (applying Texas law). In Curlett, the Fifth Circuit held that, "[s]ince there is no other contract between the parties or applicable Texas statute that provides for attorneys' fees, there was no basis for [defendant] to recover attorneys' fees under law."

The Court finds Curlett persuasive in this case. Plaintiff's interpretation of the contract would render the words "provided . . . by law" superfluous; plaintiff would be entitled to attorneys' fees regardless of whether there was a law that permitted their recovery. Rather, the plain meaning of the Parking Lease is that plaintiff is entitled to attorneys' fees only to the extent

24

that some external source of law provides for them. Cf. McMullen, 985 A.2d at 771 (involving contract provision stating that "the party breaching this contract shall be responsible for payment of legal fees and costs incurred by the other in enforcing their rights under this Agreement"). Here, no such law provides for attorneys' fees. Thus, the Court grants Five Star's Motion for Summary Judgment as to the issue of attorneys' fees.

## V. CONCLUSION

For the foregoing reasons, the Court denies Plaintiff Richard Basciano's Motion for Summary Judgment. The Court also denies Defendant LR FSP's Motion for Summary Judgment with respect to the following issues: (1) the alleged underpayment of rent, (2) insurance coverage, (3) liability after assignment to Ampco, (4) liability after December 31, 2009, and (5) the statute of limitations. The Court grants Defendant LR FSP's Motion for Summary Judgment with respect to the 2011 real estate taxes and attorneys' fees issues.

An appropriate Order follows.